**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| WILLIAM WILSON and SARAH WILSON,<br><br>        Plaintiffs,<br><br>v.<br><br>BETTER MORTGAGE CORPORATION,<br><br>        Defendant. | Case No. 4:26-cv-00885-MAL |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT BETTER MORTGAGE CORPORATION'S MOTION TO DISMISS THE FIRST AMENDED PETITION**

**PRELIMINARY STATEMENT**

Better Mortgage Corporation ("BMC") issued the Wilsons a written Mortgage Commitment Letter that says, in words BMC drafted and now wishes the Court would ignore, that "the lender **is obligated** to make a mortgage loan to you," and that the Commitment "**is binding on both parties**"—a phrase BMC printed twice, once in oversized bold type. On the strength of that binding writing, a young family with an infant daughter gave up their California home, loaded an interstate moving truck, wired their cash-to-close, and drove 1,800 miles to a home an FHA appraiser had just valued $13,000 above the purchase price. BMC then refused to fund—not because the Wilsons failed to perform, but because its own loan officer told the borrower the loan was "clear to close" in the very same hours its closing department told the settlement agent the opposite. BMC manufactured a "reserve requirement" it had earlier waived, invented a "large or recurring" Klarna "debt" out of three paid-in-full purchases totaling $107.94, and denied the loan for the single word "UnverifiableInformation."

1

Confronted with a First Amended Petition that pleads this conduct in exhaustive detail, BMC's supporting Memorandum does not engage the facts—it rewrites them. Its brief suffers from four recurring defects. **First**, it asks the Court to resolve fact questions—whether conditions were satisfied, whether BMC's own conduct prevented their satisfaction, whether reliance was reasonable, whether employees acted outside their roles—in BMC's favor on the pleadings, contrary to the rule that all well-pleaded facts and inferences run to the Wilsons. **Second**, its premise that unmet "conditions precedent" excuse non-funding collapses on Missouri's prevention doctrine: a lender cannot sit on the title work, defer employment verification to the eleventh hour, and manufacture a bogus debt, then claim the resulting delay as a "condition" discharging its own promise. **Third**, BMC manufactures an "admission" that Mr. Wilson "lost both jobs" by quoting a *proposed* pleading (Doc. 23-1) and its own counsel's declaration (Doc. 38); the operative Petition alleges the opposite—continuous employment (First Am. Pet. ¶¶ 11–12)—and even the proposed pleading blames BMC's stalling for the *later* job loss. **Fourth**, BMC misreads its own authorities—its lead MMPA case reversed a dismissal, its tortious-interference theory ignores that misrepresentation is "improper means," and its document-incorporation argument invites the Court to read a Commitment Letter that says the lender "is obligated" to lend. The Motion should be denied.

## STATEMENT OF FACTS

The following facts are alleged in the operative First Amended Petition and are, at this stage, accepted as true.

**The binding Commitment.** On February 17, 2026, after the Wilsons applied for an FHA purchase-money loan, locked their rate at 5.875%, and signed the FHA Amendatory Clause, BMC issued a written Mortgage Commitment Letter for a $395,650 loan on the property at 1239 Stono

2

Mountain Drive. The Commitment states on its face that it "sets forth the terms and conditions upon which the lender **is obligated** to make a mortgage loan to you," and declares—twice, once in large bold type—that "The Commitment Agreement **is binding on both parties**." Mr. Wilson accepted and signed the Commitment. (First Am. Pet. ¶ 19; Commitment Letter, Ex. B.)

**Reliance and relocation.** On February 25, 2026, loan officer Ashley Gould-Martinez told Mr. Wilson BMC had "already verified enough assets and income" and that he could "ignore" the 401(k) task. In reliance on the binding Commitment and these assurances, on February 27 the Wilsons loaded an interstate carrier, moved their family—including their infant daughter—from California to Missouri, and wired their cash-to-close. (First Am. Pet. ¶¶ 20–21.)

**BMC's shifting, manufactured objections.** Four days before the March 13 closing, BMC reversed course and imposed an $8,500 "reserve requirement," falsely representing that "all FHA loans require reserves"; falsely claimed the title work was "ordered, not received" though the settlement agent had sent it weeks earlier; and flagged three ordinary paid-in-full debit purchases ($52.40, $40.00, $15.54) as "large or recurring" Klarna "payments." Mr. Wilson submitted documentation confirming a $0 Klarna balance, but BMC never cleared the objection—on which ground the March 13 closing failed. (First Am. Pet. ¶¶ 22–26.)

**The contradictory "clear to close."** On March 17, 2026, Ms. Gould-Martinez texted "Got the clear to close!!!!," and the settlement agent revised the closing disclosure and set closing for the next day—while, that same day, BMC's closing department told the settlement agent the loan was "No[t] clear to close," citing pending employment verification. BMC issued directly contradictory representations to two participants in the same closing on the same day. (First Am. Pet. ¶¶ 27–31.)

**Non-funding, denial, and harm.** On March 19, 2026, BMC did not fund; on April 1, it issued an Adverse-Action Notice stating a single reason: "UnverifiableInformation." The Wilsons—displaced with an infant—lost the benefit of a $410,000 contract on a home appraised at $423,000, incurred storage and housing costs, faced forfeiture of their earnest money, and, as to Mr. Wilson (whose bipolar diagnosis BMC knew), suffered a medically significant aggravation of his condition. (First Am. Pet. ¶¶ 11, 33–43.)

## ARGUMENT

### I. The Rule 12(b)(6) Standard Forecloses BMC's Fact-Driven Motion.

The Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences for the Wilsons; the plausibility standard "does not impose a probability requirement," requires "no . . . direct evidence," and does not permit "[f]erreting out the most likely reason for the defendants' actions . . . at the pleadings stage." [1] BMC's Motion transgresses these limits on nearly every page: it asks the Court to *find* that conditions were unmet, that non-funding was "not a discretionary decision," that reliance was unreasonable, that no employee acted outside his role, and that BMC's stated reasons were genuine—each a contested fact the Petition pleads the other way, and each properly tested "on a Rule 56 motion for summary judgment" after discovery, not now. [2]

### II. BMC's Motion Rests on a Mischaracterized Record and a Pleading Not Before the Court.

#### A. BMC Fundamentally Mischaracterizes the Employment Allegations.

BMC's Motion is built on a factual inversion the Court should reject at the threshold. BMC tells the Court that Plaintiffs "concede" Mr. Wilson "had in fact lost both jobs" and that his "reported

---

[1] McDonough v. Anoka County, 799 F.3d 931, 945–46 (8th Cir. 2015) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)).
[2] See Edwards v. City of Florissant, 58 F.4th 372 (8th Cir. 2023).

employer was no longer employing him," and from that supposed concession argues its non-funding was compelled because it "could not verify" employment "that did not exist." (Mem. in Supp. 2–3, 5.) The operative First Amended Petition alleges the *opposite*, and on a Rule 12(b)(6) motion its allegations—not BMC's rewrite of them—control.

The Petition alleges Mr. Wilson was **continuously employed** throughout: employed with DLG since November 2024 "uninterrupted through and after the events alleged," his February 2026 move to remote work being "a change in work location, not a change in employer or in employment status," and his secondary BD&J work "an increase in, not a disruption of," his income, with "employer-of-record and W-2 status remain[ing] continuous and unchanged." (First Am. Pet. ¶¶ 11–12.) That is the opposite of the "admission" BMC attributes to it. The Petition further pleads that BMC's "unverifiable employment" rationale was pretextual (First Am. Pet. ¶ 12) and that BMC possessed current documentation confirming both jobs. Whether BMC held those confirmations, and whether its eleventh-hour "VOE" problem was genuine or a pretext of its own delay, are fact questions for discovery—not matters BMC may resolve in its favor by recharacterizing the pleading.

### *B. BMC Improperly Relies on a Proposed Pleading and an Attorney Declaration.*

The mischaracterization is compounded by *where* BMC draws it from. The "lost both jobs" and "could not verify" assertions appear nowhere in the operative First Amended Petition (Doc. 1-1) BMC moves to dismiss; BMC sources them to the *proposed* Second Amended Petition (Doc. 23-1) and its own counsel's Declaration (Doc. 38). (Mem. in Supp. 2–3, 5.) That proposed pleading has *not been accepted* and is the subject of a pending motion for leave. A Rule 12(b)(6) motion tests the operative pleading's allegations, taken as true—not a defendant's preferred version drawn from an unaccepted document and its lawyer's declaration.

The maneuver is also substantively misleading. Even in the proposed pleading BMC quotes selectively, the later job loss is pleaded as an injury **BMC caused**: BMC's eleventh-hour employment-verification demand, made to a borrower it knew was bipolar, "precipitated an acute manic episode" such that "[b]ut for Better's misrepresentations . . . and [its] decision to defer verbal employment verification until the eleventh hour," he "would not have suffered the manic episode that destroyed both employment relationships." (Proposed Second Am. Pet. ¶¶ 44A–44D.) BMC thus lifts an allegation that *blames BMC* and recasts it as a borrower "admission" excusing BMC. A defendant may not manufacture the injury and then plead it as its excuse. Every argument resting on the "lost jobs" narrative should be disregarded for this reason alone.

BMC's invocation of *Zean v. Fairview Health Services*, 858 F.3d 520 (8th Cir. 2017), does not rescue it. The embrace doctrine permits the Court to consider the *Commitment Letter*—and that document is the Wilsons' friend, not BMC's. It states in mandatory terms that "the lender is obligated to make a mortgage loan," and that the agreement "is binding on both parties." If the Court reads the Commitment Letter, it reads a promise to lend, subject to conditions BMC itself controlled.

### C. BMC Blew Past Its Own Deadline to Verify Employment, Waiving the Condition It Now Invokes.

The mischaracterization also obscures a dispositive timing point—one that flows directly from the very doctrine BMC invokes. Having urged the Court to read the loan documents into the pleadings under the incorporation-by-reference doctrine, BMC cannot object when the Court reads the *whole* Commitment Letter, including the term fixing BMC's own deadline. The same instrument BMC says imposed unmet "conditions" is the instrument that required BMC to complete verbal employment verification "done within ten (10) days of closing." (First Am. Pet. ¶ 19; Commitment Letter, Ex. B.) BMC thus faces a dilemma of its own making: if the Commitment Letter is out, its

"conditions precedent" defense has no documentary footing on the pleadings; if it is in, the Court reads not only that the lender "is obligated" to lend, but that BMC blew the March 3 deadline that document imposed on *it*. With closing set for March 13, BMC had to complete VOE by on or about March 3, or seek an extension. It did neither, letting that window pass in silence and first raising VOE on March 17–18. (First Am. Pet. ¶¶ 28, 32.) Plaintiffs do not contend BMC lacked the right to verify employment; they contend that sitting on that step until the eleventh hour excuses the condition under the prevention doctrine—and, in the alternative, supports a finding of *waiver*. The prevention doctrine is the cleaner theory on these facts, because it turns on causal hindrance rather than intent: a promisor that prevents or hinders the occurrence of a condition may not avail itself of the nonperformance it induced or occasioned. *See infra* Part III.A; AEE-EMF, Inc. v. Passmore, 906 S.W.2d 714, 721–22 (Mo. Ct. App. 1995). Waiver supplies an independent, fallback ground. "A party may waive any condition of a contract in the party's favor, and that waiver may be implied from conduct," [3] and "[e]ven in the absence of an express right of waiver, a party may waive [a] condition . . . included in the contract for the sole benefit and protection of the party waiving it." [4] The VOE requirement protected BMC's underwriting interest, so BMC could relinquish it, and "whether a party's conduct can be construed as an implied waiver is a question of fact"—one the Court cannot resolve against the Wilsons on the pleadings. [5] BMC may respond that implied waiver demands conduct "so manifestly consistent with and indicative of an intention to renounce a particular right . . . that no other reasonable explanation of the conduct is possible," [6] and that mere delay in requesting VOE does not meet that demanding standard. That

---

[3] Old Navy, LLC v. South Lakeview Plaza I, LLC, No. ED111214 (Mo. Ct. App. E.D. July 18, 2023).
[4] Howard v. Youngman, 81 S.W.3d 101, 111 (Mo. Ct. App. 2002).
[5] Old Navy, supra; see Hastings & Chivetta Architects v. Burch, 794 S.W.2d 294, 297 (Mo. Ct. App. 1990) (law implies a reasonable time to perform).
[6] Old Navy, supra (quoting Blue Ridge Bank & Tr. Co. v. Trosen, 221 S.W.3d 451, 462 (Mo. Ct. App. 2007)).

objection only underscores the point: whether BMC's course of conduct clears the implied-waiver threshold is itself a fact question, and in all events the Wilsons need not rely on waiver alone, because the prevention doctrine excuses the condition without any showing of intent to relinquish.

**The pleaded sequence confirms this was a shifting-pretext problem, not a VOE problem.** The March 13 closing did not fail for want of employment verification; it failed on the manufactured Klarna objection—"[a]s a foreseeable result of Better's manufactured and persistently maintained 'Klarna' objection, the March 13, 2026 closing did not proceed," and "[t]he Seller refused to extend and issued a written 'close-or-release' notice." (First Am. Pet. ¶¶ 25–26.) BMC's non-funding on that date placed the Wilsons in default and triggered the Seller's ultimatum. Only *after* that collapse did BMC pivot: on March 17 its loan officer texted "Got the clear to close!!!!," the portal let the Wilsons schedule closing for March 19, and only on March 18—after the text, after scheduling, and after the close-or-release deadline had destroyed any cushion—did BMC first raise employment verification. (First Am. Pet. ¶¶ 27, 32.) A lender that misses its own deadline, lets a closing collapse on a fabricated ground, represents "clear to close," then springs a different condition on the eve of the rescheduled closing cannot convert that shifting sequence into a defense. Whether that conduct waived, excused, or estops the condition are fact questions for a later stage.

To the extent BMC's theory turns on the internal status of Mr. Wilson's DLG employment, that too is a disputed fact for discovery: the Petition alleges his employment remained continuous and the "unverifiable employment" objection was pretextual. (First Am. Pet. ¶¶ 11–12.) Should the Court deem further detail material, Plaintiffs respectfully request leave to amend to plead it.

**III. The Contract and Promissory-Estoppel Claims Are Well Pleaded (Counts I, II, VIII).**

   *A. Breach of the Mortgage Loan Commitment (Count I).*

An accepted written loan commitment **is an enforceable contract**. In *Hall v. W.L. Brady Investments, Inc.*, 684 S.W.2d 379 (Mo. Ct. App. 1984), the court held that a commitment letter issued to a borrower and accepted "constitutes the contract" for breach of which the lender "may be liable."[7] The Petition pleads each element of breach under *Keveney v. Missouri Military Academy*, 304 S.W.3d 98 (Mo. banc 2010): a binding written Commitment; the Wilsons' performance (locking the rate, paying fees, signing certifications, wiring cash-to-close, standing ready to close); BMC's breach by refusing to fund; and substantial damages. (First Am. Pet. ¶¶ 45–55.) Although *Keveney* arose in the employment context, the four elements it recites are the general common-law elements of any breach-of-contract claim in Missouri—not an employment-specific formulation—and *Keveney* is routinely cited for exactly that proposition.

   **BMC's "conditions precedent" defense fails as a matter of law and fact.** BMC argues the Commitment was "conditional" and the conditions "were not met." But Missouri law does not permit a promisor to escape its promise by pointing to a condition *it prevented from occurring*. "[I]f a promisor prevents or hinders the occurrence . . . of a condition . . . then the performance of the condition is excused," and "[o]ne who hinders performance by the other party may not avail himself of the nonperformance which he induced or occasioned."[8]

   That doctrine decides this Motion. Every "condition" BMC invokes was one BMC controlled and frustrated—it sat on delivered title work, deferred VOE to the eleventh hour, and manufactured a Klarna "debt" it never cleared (as detailed in Part II.C, supra; First Am. Pet. ¶¶ 22–26, 28, 32)—so whether the conditions were satisfied or were excused by BMC's own

---

[7] Hall v. W.L. Brady Invs., Inc., 684 S.W.2d 379, 383 (Mo. Ct. App. 1984).

[8] AEE-EMF, Inc. v. Passmore, 906 S.W.2d 714, 721–22 (Mo. Ct. App. 1995) (quoting Hillis v. Blanchard, 433 S.W.2d 276, 279 (Mo. 1968)).

9

prevention is a fact question that cannot be resolved against the Wilsons on the pleadings. Even where a commitment turns on the lender's "satisfaction," Missouri applies an objective "reasonable person" standard whenever the satisfaction clause "involves a commercial judgment and not a personal judgment based on taste or aesthetics"; the promisor "must exercise that judgment in good faith and as a reasonable man, not arbitrarily without a bona fide reason for his dissatisfaction." [9] That objective standard governs a loan commitment directly. [10] A lender therefore cannot manufacture its own dissatisfaction to avoid funding. And *Hall* confirms the Wilsons' rate-differential damages theory: a borrower forced into the open market may recover the difference between the committed and replacement interest rates. [11]

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II).

BMC misstates the claim. Count II does not seek to "create an absolute funding obligation"; it enforces the covenant implied in *every* Missouri contract that a party vested with discretion exercise it in good faith. "The good faith obligation requires that contracting parties **not prevent or hinder performance** by the other party," and "prevents one party . . . from exercising a judgment conferred by the . . . agreement in a manner that evades the spirit of the transaction or denies the other party the expected benefit of the contract." [12]

BMC held near-total discretion over underwriting, verification, conditions-clearance, and closing coordination. The Petition alleges it abused that discretion—reversing prior assurances only *after* the Wilsons relocated and wired funds, asserting pretextual objections, sitting on its own tasks, and issuing contradictory clear-to-close representations on the same day. (First Am. Pet. ¶¶

---

[9] McCarthy Bldg. Cos. v. City of St. Louis, 81 S.W.3d 139, 145 (Mo. Ct. App. 2002) (quoting Hickham v. Chronister, 792 S.W.2d 631, 633 (Mo. Ct. App. 1990)).

[10] Hall, 684 S.W.2d at 386–88 (applying the objective reasonable- person standard to a lender's commitment). McCarthy arose in a construction-escrow context; Hall applies the same objective standard directly to a loan commitment.

[11] Id. at 391.

[12] Finova Capital Corp. v. Ream, 230 S.W.3d 35, 45 (Mo. Ct. App. 2007).

49, 56–59.) That is not "erroneous judgment" but the bad-faith frustration of the counterparty's expected benefit the covenant forbids. BMC's own authority, *City of Webster Groves v. CCATT LLC*, confirms the standard turns on whether discretion was "bad faith" or "arbitrary or capricious"—a fact question, not a pleading defect.

### C. Promissory Estoppel (Count VIII).

Count VIII is expressly pleaded **in the alternative**, "to be reached only if the Court determines that the . . . Commitment is not enforceable as a binding contract." (First Am. Pet. ¶ 108.) Rule 8(d) permits alternative and inconsistent pleading, so BMC's "duplicative" argument is self-defeating: if there is no enforceable contract, estoppel is the remedy; if the Commitment is enforceable, Count VIII falls away. Dismissing it before the Court decides whether a contract exists is premature. The elements are pleaded—definite promises, reasonable and foreseeable reliance (vacating housing, moving 1,800 miles, wiring funds), and injustice curable only by enforcement. (First Am. Pet. ¶¶ 108–113.)

## IV. The Fraud, Negligent-Misrepresentation, and MMPA Claims Are Well Pleaded (Counts III, IV, V).

### A. Fraud Is Pleaded With Particularity, and Reliance and Causation Are Fact Questions.

The Petition identifies, for each of six representations, the speaker, date, substance, falsity, and materiality—satisfying Rule 9(b). (First Am. Pet. ¶ 62(a)–(f).) BMC's argument that its statements caused no reliance because they postdated the February 27 relocation misreads the pleaded chronology. The inducing misrepresentations came *before* the move. On February 25, 2026—two days before the Wilsons loaded the moving truck—loan officer Ashley Gould-Martinez told Mr. Wilson that BMC had "already verified enough assets and income" and that he could "ignore" the outstanding 401(k) task. (First Am. Pet. ¶¶ 20–21.) Those assurances were the direct cause of

11

the Wilsons' decision to give up their California home, move their family 1,800 miles, and wire their cash-to-close: had BMC disclosed that its verification was in fact incomplete—and that it would later treat unmet verification and a manufactured "reserve" and Klarna "debt" as grounds to refuse to fund—the Wilsons would not have moved forward. The pleaded course of the loan demonstrates the February 25 statements were false when made: BMC's own subsequent conduct—reopening asset and reserve demands, insisting employment remained "unverifiable," and denying the loan for "UnverifiableInformation"—is irreconcilable with a representation that "enough" income-and-asset verification "has been done." (First Am. Pet. ¶¶ 22–26, 32–33.)

Reliance also continued after the move. The Wilsons wired cash-to-close *after* relocating, forwent replacement options, and remained committed to the purchase in reliance on the "clear to close" representation and BMC's ongoing assurances. (First Am. Pet. ¶¶ 21, 27, 32, 39–43.) In all events, whether reliance was reasonable and whether it caused damage are jury questions the Court "cannot . . . seek to ascertain" on the pleadings. [13]

### B. The Economic-Loss Rule Does Not Bar These Claims.

The economic-loss doctrine bars a tort claim that is *merely* a restatement of a contract claim—but not fraud predicated on breach of an **independent duty**, including the duty not to fraudulently induce reliance. A party "who fraudulently induces another to contract and then also refuses to perform . . . commits two separate wrongs, so that the same transaction gives rise to distinct claims." [14] BMC's misrepresentations were not merely "we will not perform"; they were affirmative misstatements of *present fact* (assets already verified, title not received, a nonexistent recurring debt, a "clear to close" BMC knew was false) designed to keep the Wilsons committed while BMC ran out the clock. Whether they are "independent" of contractual performance is a

---

[13] See McDonough, 799 F.3d at 946.
[14] Schreibman v. Zanetti, 909 S.W.2d 692, 699 (Mo. Ct. App. 1995).

fact-bound inquiry; BMC's own authority, *Superior Edge, Inc. v. Monsanto Co.*, recognizes the exception for claims "truly outside the bounds of the contract." The Wilsons' fraud claim is not duplicative of their contract claim in any event: their fraud damages include harm distinct from the contract measure—relocation and storage costs, the lost benefit of the purchase contract, and the medically significant aggravation of Mr. Wilson's condition—so no later merger of the two recoveries is warranted. [15]

Negligent misrepresentation (Count IV) stands on the independent duty a lender assumes **once it undertakes to supply information for the borrower's guidance**. *Bailey v. Hawthorn Bank*, 382 S.W.3d 84 (Mo. Ct. App. 2012); *Frame v. Boatmen's Bank of Concord Village*, 824 S.W.2d 491 (Mo. Ct. App. 1992). BMC supplied a stream of information about assets, title, tasks, and closing status; the Petition alleges it did so carelessly, causing pecuniary loss. That states a claim.

### C. The MMPA Claim: The Wilsons "Purchased" Loan Merchandise (Count V).

BMC's MMPA argument is its weakest. The controlling framework comes from *Raster v. Ameristar Casinos, Inc.*, 280 S.W.3d 120 (Mo. Ct. App. 2009), where the court **reversed a dismissal** and held that a consumer who drops a token into a machine "is 'purchasing' 'merchandise' within the meaning and scope of the MMPA, even though there is no guarantee of return." [16] *Raster* turns on the payment of value, not on consummation of the underlying transaction: "purchase" means "to obtain by paying money or its equivalent," [17] and the "unsuccessful attempt" line BMC quotes applies only to a would-be buyer who "never receives

---

[15] Cf. Schreibman, 909 S.W.2d at 699–700 (fraudulent inducement and breach are distinct wrongs, though duplicative "benefit of the bargain" awards may merge absent separately pleaded special damages).

[16] Raster v. Ameristar Casinos, Inc., 280 S.W.3d 120, 130 (Mo. Ct. App. 2009).

[17] Id. at 127.

the goods or services **nor pays anything of value**." [18] The Wilsons paid ample value—a commitment fee, application fees, an appraisal fee, credit-report fees, and a cash-to-close wire. They are not disappointed window-shoppers; they paid real money for a bundle of loan services BMC then refused to deliver. Under *Raster*'s own logic, they "purchased" merchandise and suffered ascertainable loss; at a minimum, whether a "purchase" occurred is a fact question unsuitable for dismissal.

*Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410 (Mo. banc 2014), supplies the operative "in connection with" standard. There, the Missouri Supreme Court held that "a loan is an agreed upon bundle of services being 'sold' by the lender to the borrower," and that an unlawful practice violates the Act "whether committed before, during or after the sale," so long as it is "in connection with" the sale. [19, 20] BMC's deceptive conduct—the manufactured reserve, the phantom Klarna debt, the contradictory "clear to close," the vacuous denial—was made squarely "in connection with" the sale of that loan merchandise. Plaintiffs do not read *Conway* to resolve whether a loan must be funded before an MMPA claim lies; *Conway* did not address that question, and it need not be reached here, because *Raster* independently establishes that a consumer who pays value has "purchased" merchandise. Whether that occurred is, at worst, a fact question for discovery.

## V. The Tortious-Interference Claim Is Well Pleaded (Count VI).

BMC's justification defense fails because **misrepresentation is "improper means."** Missouri law is explicit: "improper means are those that are independently wrongful such as threats, violence, trespass, defamation, **misrepresentation of fact**, restraint of trade or any other wrongful act." [21]

---

[18] Id. at 128 (quoting Jackson v. Charlie's Chevrolet, Inc., 664 S.W.2d 675, 677 (Mo. App. 1984)).
[19] Conway v. CitiMortgage, Inc., 438 S.W.3d 410, 415 (Mo. banc 2014).
[20] See also Watson v. Wells Fargo Home Mortg., Inc., 438 S.W.3d 404, 407 (Mo. banc 2014) (loan "sale" is a continuing transaction, not a single instant).
[21] BMK Corp. v. Clayton Corp., 226 S.W.3d 179, 200 (Mo. Ct. App. 2007).

And a defendant with an economic interest "was only justified to interfere . . . if [it] did not use improper means. It is not justification to knowingly procure the breach of a contract where the defendant acts with an improper purpose and . . . employs improper means." [22]

The Petition alleges BMC knew of the Wilsons' $410,000 purchase contract and interfered through improper means. The improper means are laid bare by a single, irreconcilable inconsistency: on the same day, BMC told the two participants in the same closing directly opposite things. To the settlement agent, BMC's closing department represented that the loan was "not clear to close" and that the "buyer has outstanding tasks"; to the Wilsons, BMC represented the exact opposite—its loan officer texted "Got the clear to close!!!!," the portal permitted them to schedule closing, and BMC held the transaction out as imminent. (First Am. Pet. ¶¶ 27–31, 37, 89–98.) Both statements could not be true. BMC either misrepresented the loan's status to the settlement agent (torpedoing the Wilsons' closing with a third party) or misrepresented it to the Wilsons (stringing them along while it ran out the clock)—and on a motion to dismiss, that contradiction must be read against BMC, not resolved in its favor. A lender that tells the party controlling the closing "not clear to close" while telling its borrower "clear to close" has not exercised a legitimate economic privilege; it has deployed the very "misrepresentation of fact" that Missouri law treats as improper means. The Missouri Court of Appeals recently reaffirmed the same rule: "even if a defendant has justification for interfering with a business expectancy, the defendant must not employ 'improper means,'" which "are those that are independently wrongful," such as "misrepresentation," and "[u]sing improper means destroys any justification the defendant may have had for interfering." [23] BMC's "we were only a lender protecting our economic interest" argument is thus exactly the justification defense *BMK* forecloses when improper means are used.

---

[22] Id. at 199.
[23] Reyna Hotel Corp. v. Lotus Hospitality Mgmt., LLC, No. WD86858 (Mo. Ct. App. W.D. Apr. 29, 2025).

15

Importantly, whether a defendant's statements amount to misrepresentation—and so to improper means—is itself a fact question, not a matter to be resolved on the pleadings. [24] Whether BMC's objections were legitimate or pretextual, and whether its misrepresentations caused the collapse, are therefore questions for discovery. The claim survives.

## VI. The Emotional-Distress Claims Are Well Pleaded (Counts VII, X).

### A. Negligent Infliction (Count VII).

Missouri abolished the impact rule in *Bass v. Nooney Co.*, 646 S.W.2d 765 (Mo. banc 1983): a plaintiff may recover for NIED where "(1) the defendant should have realized that his conduct involved an unreasonable risk of causing the distress; and (2) the emotional distress . . . [is] medically diagnosable and . . . medically significant." [25] A direct-victim plaintiff need not satisfy any zone-of-danger requirement. [26]

BMC's "no lender duty" cases (*Pace*, *Wood & Huston*) address only the general rule that a lender-borrower relationship is contractual. But the Petition pleads an **independent tort duty**—the duty a lender assumes when it "undertakes to provide information . . . for the borrower's guidance" to do so with due care, *see Frame*, 824 S.W.2d 491, and *Bailey*, 382 S.W.3d 84—coupled with allegations that Mr. Wilson's bipolar disorder was "known to Better" and that BMC knew a failed closing was especially hazardous to him. (First Am. Pet. ¶¶ 11, 99–107.) Under *Bass*, the dispositive question is foreseeability—whether "circumstances known to the actor should apprise him" of the risk—and BMC's knowledge of that condition, plus the cross-country reliance, makes that a jury question. The Petition alleges resulting distress that is "medically diagnosable

---

[24] See id. (treating whether a defendant's conduct constituted misrepresentation, and thus improper means, as a question for the jury on the evidence presented).
[25] Bass v. Nooney Co., 646 S.W.2d 765, 772–73 (Mo. banc 1983).
[26] Jarrett v. Jones, 258 S.W.3d 442 (Mo. banc 2008).

and medically significant" (First Am. Pet. ¶¶ 43, 104–105)—precisely the injury *Bass* makes actionable.

### B. Intentional Infliction (Count X).

Whether conduct is "extreme and outrageous" is ordinarily a fact question, assessed on the totality of the conduct in the light most favorable to the Wilsons—not, as BMC does, by minimizing each act in isolation. The Petition alleges BMC issued a binding commitment, let a family with an infant relocate 1,800 miles in reliance on imminent funding, represented "clear to close" to the borrower while telling the settlement agent the opposite, and did so knowing Mr. Wilson's disclosed psychiatric vulnerability. (First Am. Pet. ¶¶ 123–129.) A factfinder could conclude that exploiting a known vulnerability to string a family along through a manufactured collapse exceeds "all possible bounds of decency." Count X is pleaded in the alternative to Count VII and should proceed.

## VII. The Civil-Conspiracy Claim Is Well Pleaded (Count IX).

BMC invokes the intracorporate-conspiracy doctrine, but the Petition pleads around it. The doctrine does not apply where employees act **outside the scope of their employment** or for **personal interests** distinct from the corporation's. The Petition alleges named individuals—Gould-Martinez, Sapui, Chan, and others—pursued interests "distinct from BMC's unified corporate interest" and coordinated mutually reinforcing misstatements. (First Am. Pet. ¶¶ 114–122.) BMC's "speculative" retort is a merits argument for summary judgment; whether the individuals acted outside their roles is a fact question for discovery, and the claim is pleaded as an alternative theory of concerted liability.

17

**CONCLUSION**

BMC drafted a commitment saying it "is obligated" to lend and is "binding on both parties," took the Wilsons' money, let them move their family across the country, told them the loan was "clear to close," and then refused to fund on objections it manufactured and conditions it prevented. Its Motion asks the Court to resolve those disputes in its favor on the pleadings—by treating an unaccepted pleading as admissions and misreading its own authorities—which is not the office of a Rule 12(b)(6) motion. Because the First Amended Petition states plausible claims on every count, the Court should deny the Motion in its entirety, or in the alternative grant leave to amend.

Dated: July 17, 2026

Respectfully submitted,

/s/ William Wilson
William Wilson
P.O. Box 227
Farmington, Missouri 63640
Telephone: (573) 315-5902
Wilwilson1217@outlook.com


/s/ Sarah Wilson
Sarah Wilson
P.O. Box 227
Farmington, Missouri 63640
Telephone: (573) 315-5902
Swilson121722@gmail.com

Plaintiffs, Pro Se

**CERTIFICATE OF SERVICE**

I hereby certify that on the date set forth below, the foregoing was filed with the Clerk of Court and served upon all counsel of record via the CM/ECF system.

Dated: July 17, 2026

/s./ William Wilson